LOURIE, Circuit Judge,
concurring, with whom Circuit Judges DYK, PROST, REYNA, and WALLACH join.
Alice Corporation (“Alice”) appeals from the grant of summary judgment in favor of declaratory judgment plaintiffs CLS Bank International and CLS Services, Ltd. (collectively, “CLS”) by the United States District Court for the District of Columbia holding that certain claims of Alice’s U.S. Patents 5,970,479 (the “'479 patent”), 6,912,510 (the “'510 patent”), 7,149,720 (the “'720 patent”), and 7,725,375 (the “'375 patent”) are invalid under 35 U.S.C. § 101. CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221 (D.D.C.2011). On July 9, 2012, a panel of this court reversed, holding that the claims at issue, including claims drawn to methods, computer-readable media, and systems, were all patent eligible under § 101. CLS Bank Int’l v. Alice Corp., 685 F.3d 1341 (Fed.Cir.2012), vacated, 484 Fed.Appx. 559 (Fed.Cir.2012). CLS filed a petition for rehearing en banc, which was granted on October 9, 2012. CLS Bank Int’l v. Alice Corp., 484 Fed.Appx. 559 (Fed.Cir.2012).
*1274 As described more fully below, we would affirm the district court’s judgment in its entirety and hold that the method, computer-readable medium, and corresponding system claims before us recite patent-ineligible subject matter under 35 U.S.C. § 101.[1]
Background
I. Alice’s Patents
Alice, an Australian company, owns the '479, '510, '720, and '375 patents by assignment. The patents, which all derive from the same family and share substantially the same specification, concern “the management of risk relating to specified, yet unknown, future events.” '479 patent col. 1, 11. 8-10. In particular, the patents relate to a computerized trading platform used for conducting financial transactions in which a third party settles obligations between a first and a second party so as to eliminate “counterparty” or “settlement” risk. CLS Bank, 768 F.Supp.2d at 224. Settlement risk refers to the risk to each party in an exchange that only one of the two parties will actually pay its obligation, leaving the paying party without its principal or the benefit of the counterparty’s performance. Alice’s patents address that risk by relying on a trusted third party to ensure the exchange of either both parties’ obligations or neither obligation. Id.
For example, when two parties agree to perform a trade, in certain contexts there may be a delay between the time that the parties enter a contractual agreement obligating themselves to the trade and the time of settlement when the agreed trade is actually executed. Ordinarily, the parties would consummate the trade by paying or exchanging their mutual obligations after the intervening period, but in some cases one party might become unable to pay during that time and fail to notify the other before settlement. Id. As disclosed in Alice’s patents, a trusted third party can be used to verify each party’s ability to perform before actually exchanging either of the parties’ agreed-upon obligations. Id.; see also '479 patent col. 5 11. 61-63 (“The invention also encompasses apparatus and method dealing with the handling of contracts at maturity, and specifically the transfer of entitlement.”).
The claims currently before the court include claims 33 and 34 of the '479 patent and all claims of the '510, '720, and '375 patents. The relevant claims of the '479 and '510 patents recite methods of exchanging obligations between parties, the claims of the '720 patent are drawn to data processing systems, and the claims of the '375 patents claim data processing systems as well as computer-readable media containing a program code for directing an exchange of obligations.
II. District Court Proceedings
On May 24, 2007, CLS filed suit against Alice seeking a declaratory judgment of noninfringement, invalidity, and unenforceability as to the '479, '510, and '720 patents. Alice answered and counterclaimed, alleging infringement. By the agreement of the parties, the district court allowed limited initial discovery, addressing only the questions of (i) the operations of CLS, and (ii) CLS’s relationship with the accused CLS system. CLS Bank Int’l v. Alice Corp., No. 07-cv-00974 (D.D.C. Feb. 21, 2008), ECF No. 24 (Scheduling Order).
*1275 In March 2009, following limited discovery, CLS moved for summary judgment on the bases that any possible infringement could not be said to have occurred in the United States and that Alice’s asserted claims were drawn to ineligible subject matter and therefore invalid under 35 U.S.C. § 101. Alice filed cross-motions on both issues. The district court denied CLS’s motion as to extraterritoriality on October 13, 2009, finding that CLS’s alleged infringing acts fell within the reach of domestic patent law. CLS Bank Int’l v. Alice Corp., 667 F.Supp.2d 29, 33-38 (D.D.C.2009). Regarding subject-matter eligibility under § 101, the district court summarily denied the parties’ motions on June 16, 2009, without prejudice to refiling, after the Supreme Court granted certiorari to review our decision in In re Bilski, 545 F.3d 943 (Fed.Cir.2008) (en banc), cert. granted sub. nom. Bilski v. Doll, — U.S. -, 129 S.Ct. 2735, 174 L.Ed.2d 246 (2009).
In the meantime, the '375 patent issued, and Alice filed amended counterclaims additionally asserting that CLS infringed each claim of the '375 patent. After the Supreme Court issued its decision in Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), the parties renewed their crossmotions for summary judgment on the question of validity under § 101, with CLS adding invalidity contentions drawn to the newly issued '375 patent. Along with the parties’ briefing, the district court also had before it (i) the asserted patents themselves, (ii) excerpts from the patents’ prosecution histories, (iii) various guidelines issued by the United States Patent and Trademark Office (“PTO”) regarding the application of § 101 during patent examination, and (iv) a declaration submitted by Alice’s expert Paul Ginsberg. In particular, Mr. Ginsberg explained the operation of Alice’s systems and methods, see generally CLS Bank, 768 F.Supp.2d at 224, and opined that a person of skill in the art reading the asserted patents would conclude that the claimed inventions must be implemented electronically using “some type of computing processor and memory.” Ginsberg Deck, ECF No. 95-3, Ex. 1 ¶41.
The district court did not conduct claim construction before reaching the merits of the § 101 issue, but the parties agreed for purposes of deciding their summary judgment motions that Alice’s claims should all be interpreted to require a computer including at least “a processor and memory.” CLS Bank, 768 F.Supp.2d at 236; see id. at 235-36 (“The Court has yet to construe the terms of these claims.... [F]or purposes of these motions, CLS has agreed to assume a construction of terms favorable to Alice.”). With the parties’ assent, the district court assumed that all of the asserted claims required electronic implementation, noting consistent disclosures in the patents’ specifications as well as the statements of Alice’s expert, Mr. Ginsberg. Id. at 236.
With that understanding of the claims, the district court granted summary judgment in favor of CLS, holding each of the asserted claims of Alice’s patents invalid under § 101. The district court concluded that Alice’s mfethod claims “are directed to an abstract idea of employing an intermediary to facilitate simultaneous exchange of obligations in order to minimize risk.” Id. at 243. Further, the district court held the asserted system claims similarly ineligible, as those claims “would preempt the use of the abstract concept of employing a neutral intermediary to facilitate simultaneous exchange of obligations in order to minimize risk on any computer, which is, as a practical matter, how these processes are likely to be applied.” Id. at 252. The asserted media claims failed on the same ground as “directed to the same abstract concept despite the fact they nominally *1276 recite a different category of invention.” Id. at 255.
Accordingly, the district court entered final judgment in favor of CLS, and Alice timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
Discussion
I. Standard of Review
We review the grant or denial of summary judgment applying the law of the relevant regional circuit. Teva Pharm. Indus. v. AstraZeneca Pharm. LP, 661 F.3d 1378, 1381 (Fed.Cir.2011). The D.C. Circuit considers a district court’s grant of summary judgment without deference. Theodore Roosevelt Conservation P’ship v. Salazar, 661 F.3d 66, 72 (D.C.Cir.2011). We apply our own law, however, with respect to issues of substantive patent law. Aero Prods. Int’l, Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1016 (Fed.Cir.2006). Patent eligibility under § 101 presents an issue of law that we review de novo. Bancorp Servs., LLC v. Sun Life Assurance Co. of Can., 687 F.3d 1266, 1273 (Fed.Cir.2012).
II. Section 101
A. Statutory Subject Matter and Common Law Exceptions
“Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.” 35 U.S.C. § 101 (2006). Short and unadorned, § 101 appears deceptively simple on its face, yet its proper application to computer-implemented inventions and in various other fields of technology has long vexed this and other courts.
The statute sets forth four broadly stated categories of patent-eligible subject matter: processes, machines, manufactures, and compositions-of matter. As the Supreme Court has explained, Congress intended that the statutory categories would be broad and inclusive to best serve the patent system’s constitutional objective of encouraging innovation. See Diamond v. Chakrabarty, 447 U.S. 303, 308-09, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (“In choosing such expansive terms as ‘manufacture’ and ‘composition of matter,’ modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.”); Bilski, 130 S.Ct. at 3225 (“Congress took this permissive approach to patent eligibility to ensure that ‘ingenuity should receive a liberal encouragement.’” (quoting Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204)).
It is also important to recognize that § 101, while far-reaching, only addresses patent eligibility, not overall patentability. The statute directs that an invention that falls within one of its four enumerated categories “may” qualify for a patent; thus, inventions that are patent eligible are not necessarily patentable. As § 101 itself explains, the ultimate question of patentability turns on whether, in addition to presenting a patent-eligible invention, the inventor also satisfies “the conditions and requirements of this title,” namely, the novelty, nonobviousness, and disclosure requirements of 35 U.S.C. §§ 102, 103, and 112, among others. See 35 U.S.C. § 101. Congress’s broad approach to subject-matter eligibility ensures that the patent office doors remain open to most inventions, but even so, those that gain entry still must surmount various substantive and procedural hurdles that stand between patent eligibility and a valid patent. See Diamond v. Diehr, 450 U.S. 175, 191, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).
While the categories of patent-eligible subject matter recited in § 101 are broad, *1277 their scope is limited by three important judicially created. exceptions. “[L]aws of nature, natural phenomena, and abstract ideas” are excluded from patent eligibility, id. at 185, 101 S.Ct. 1048, because such fundamental discoveries represent “the basic tools of scientific and technological work,” Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). Thus, even inventions that fit within one or more of the statutory categories are not patent eligible if drawn to a law of nature, a natural phenomenon, or an abstract idea. The underlying concern is that patents covering such elemental concepts would reach too far and claim too much, on balance obstructing rather than catalyzing innovation. But danger also lies in applying the judicial exceptions too aggressively because “all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.” Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012). Taken too far, the exceptions could swallow patent law entirely.
Accordingly, the basic steps in a patent-eligibility analysis can be summarized as follows. We must first ask whether the claimed invention is a process, machine, manufacture, or composition of matter. If not, the claim is ineligible under § 101. If the invention falls within one of the statutory categories, we must then determine whether any of the three judicial exceptions nonetheless bars such a claim—is the claim drawn to a patent-ineligible law of nature, natural phenomenon, or abstract idea? If so, the claim is not patent eligible. Only claims that pass both inquiries satisfy § 101.
While simple enough to state, the patent-eligibility test has proven quite difficult to apply. The difficulty lies in consistently and predictably differentiating between, on the one hand, claims that would tie up laws of nature, natural phenomena, or abstract ideas, and, on the other, claims that merely “embody, use, reflect, rest upon, or apply” those fundamental tools. Mayo, 132 S.Ct. at 1293. For example, deciding whether or not a particular claim is abstract can feel subjective and unsystematic, and the debate often trends toward the metaphysical, littered with unhelpful analogies and generalizations. What is needed is a consistent, cohesive, and accessible approach to the § 101 analysis—a framework that will provide guidance and predictability for patent applicants and examiners, litigants, and the courts. As set forth below, the Supreme Court’s foundational § 101 jurisprudence offers the guideposts to such a system, one that turns primarily on the practical likelihood of a claim preempting a fundamental concept. We would adopt this approach to address the abstractness of the specific computer-implemented inventions presented in this- case, but it might also inform patent-eligibility inquiries arising in other contexts.
B. Foundational Section 101 Precedents
1. Gottschalk v. Benson
In Benson, the Supreme Court considered claims to computer-implemented methods “for converting binary-coded decimal (BCD) numerals into pure binary numerals.” 409 U.S. at 64, 93 S.Ct. 253. The claims each recited a series of data manipulation steps for effecting the indicated numerical conversion and “purported to cover any use of the claimed method in a general-purpose digital computer of any type.” Id. ■
Analyzing the claimed processes in view of its historical precedents, the Supreme Court concluded that the abstract, ideas exception to patent eligibility applied. The Court identified the particular abstraction at issue as the freestanding “algorithm” or *1278 “generalized formulation” for performing BCD to pure binary conversion. Id. at 65, 93 S.Ct. 253.- Next, the Court measured the scope of .the claims against the scope of that overarching abstract idea. In practice, the claims were “so abstract and sweeping as to cover both known and unknown uses of the BCD to pure binary conversion” and would thus reach every application of the basic conversion algorithm, in contrast to earlier cases concerning. patent-eligible process claims that had been cabined to discrete applications “sufficiently definite to confine the patent monopoly within rather definite bounds.” Id. at 68-69, 93 S.Ct. 253. Furthermore, even though the claims required a computer,[2] the Court did not view that as a meaningful limitation: “The mathematical formula involved here has no substantial practical application except in connection with a digital computer, which means that if the judgment below is affirmed, the patent would wholly pre-empt the mathematical formula and- in practical effect would be a patent on the algorithm itself.” Id. at 71-72, 93 S.Ct. 253. Accordingly, the claims were held ineligible for patenting under § 101.
2. Parker v. Flook
Six years later, in Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), the Supreme Court again considered the patent eligibility of a computerized process—in particular, a method for updating alarm limits for continuously monitored industrial process variables {e.g., temperature or pressure) according to a disclosed mathematical formula. See id. at 585-86, 98 S.Ct. 2522. The claim required three steps: measuring the present value of a process variable, using the mathematical formula to calculate a new alarm limit in view of the present value, and adjusting the previous alarm limit to the newly calculated limit. Id.; see also id. at 596-97, 98 S.Ct. 2522 (claim 1). A further preamble limitation restricted the claim to processes “comprising the catalytic chemical conversion of hydrocarbons,” id. at 596, 98 S.Ct. 2522, so the claim did not cover “every conceivable application of the formula,” id. at 586, 98 S.Ct. 2522.
Although the claim would not “wholly preempt” the mathematical formula, id. at 589, 98 S.Ct. 2522, the Court nonetheless held that the claimed process fell under the abstract ideas exception to patent eligibility. In its analysis, the Court viewed the formula as an abstract principle and stated that the case must “be considered as if the principle or mathematical formula were well known.” Id. at 592, 98 S.Ct. 2522. The Court then asked whether, to confer patent eligibility, the claim contained sufficient substance beyond the abstract mathematical formula itself—that is, “some other inventive concept in its application.” Id. at 594, 98 S.Ct. 2522; see also id. at 590, 98 S.Ct. 2522 (“A competent draftsman could attach some form of post-solution activity to almost any mathematical formula....”). Concluding that the field-of-use, monitoring, adjusting, and computer limitations were trivial or “well known” under such an analysis, the Court held that the claims were not patent eligible: “[I]f a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory.” Id. at 594-95, 98 S.Ct. 2522 (quoting In re Richman, 563 F.2d 1026, 1030 (CCPA 1977)).

*1279
3.Diamond v. Diehr

The claims at issue in Diehr were drawn to processes for curing synthetic rubber that included “the use of a mathematical formula and a programmed digital computer.” 450 U.S. at 177, 101 S.Ct. 1048. The claimed methods included steps for operating a rubber molding press that included constantly determining the temperature inside the mold, repetitively calculating the necessary cure time using a mathematical formula known as the Arrhenius equation, and opening the press whenever the elapsed cure time equaled the calculated necessary cure time. See id. at 179 n. 5, 101 S.Ct. 1048.
The Supreme Court held the claims to be patent eligible, a conclusion that was “not altered by the fact that in several steps of the process a mathematical equation and a programmed digital computer are used.” Id. at 185, 101 S.Ct. 1048. In contrast to Benson and Flook, the claims in Diehr employed a mathematical concept but did “not seek to preempt the use of that equation. Rather, they [sought] only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process.” Id. at 187, 101 S.Ct. 1048. In particular, the Court distinguished Flook on the basis that the claim there provided no substantive details regarding' the method’s actual performance—rather, “ ‘[a]ll that it provides is a formula for computing an updated alarm limit.’ ” See id. at 186-87, 101 S.Ct. 1048 (quoting Flook, 437 U.S. at 586, 98 S.Ct. 2522). In contrast, in Diehr, the claimed process incorporating the Arrhenius equation also called for steps including “constantly measuring the actual temperature inside the mold,” a step that was said to be new in the art. See id. at 178-79, 101 S.Ct. 1048.
The Court also explained that a claim “does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer” because “an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.” Id. at 187, 101 S.Ct. 1048. Because the applicant claimed a specific application, rather than an abstract idea in isolation, the claims satisfied § 101.

4.'Bilski v. Kappos

Bilski concerned claims to processes for participants in energy commodities markets to hedge against the risk of price changes in those commodities. The claims recited the hedging strategy as a series of steps involving transactions between a commodity provider and commodity consumers and between the commodity provider and other market participants “having a counter-risk position” to the consumers in order to balance risk; other claims articulated the hedging strategy as “a simple mathematical formula.” 130 S.Ct. at 3223-24. The claims did not require a computer.
Applying Benson, Flook, and Diehr, the Supreme Court held that the claims failed to recite a patent-eligible process because they covered the abstract idea of hedging against risk. “Allowing [the claims] would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.” Id. at 3231. In addition, the Court reiterated Flook’s admonition that such claims cannot be made patent eligible by “limiting an abstract idea to one field of use or adding token postsolution components.” Id. The Court therefore affirmed the rejection of the claims at issue under § 101.
5. Mayo v. Prometheus
The Supreme Court’s most recent guidance regarding patent eligibility drew heavily on the foregoing precedents in ap *1280 plying the “laws of nature” exception to claims covering medical diagnostic methods. The claims in Mayo recited methods for optimizing thiopurine administration in a patient based on a natural correlation between the therapeutic efficacy of a particular dose of a thiopurine and the resulting concentration of thiopurine metabolites in the patient’s blood. Too little metabolite and the dose was insufficient; too much suggested that the dose should be reduced to avoid toxicity. Mayo, 132 S.Ct. at 1294-95. Accordingly, the claims recited the specific steps of administering the thiopurine drug and determining the resulting metabolite concentration in the patient’s blood, wherein a concentration above or below predefined thresholds indicated a need to adjust the drug dose. See id. at 1295 (claim 1). ■
The Supreme Court held that those claims failed the § 101 test for subject-matter eligibility. The Court began its analysis by noting that the claims “set forth laws of nature—namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm.” Id. at 1296. Therefore, the question was “whether the claims do significantly more than simply describe these natural relations”; did they “add enough ” to the natural law to render the claimed processes patent eligible? Id. at 1297. Examining the other limitations, the Court concluded that the “administering” and “determining” steps were insufficiently limiting or inventive to confer patent eligibility: “Anyone who wants to make use of these [natural] laws must first administer a thiopurine drug and measure the resulting metabolite concentrations, and so the combination amounts to nothing significantly more than an instruction to doctors to apply the applicable laws when treating their patients.” Id. at 1298. Because these additional steps were mere “routine, conventional activity previously engaged in by scientists who work in the field,” the Court concluded that they did not transform the law of nature into a patent-eligible application of that law. Id.
C. An Integrated Approach to § 101
Several common themes that run through the Supreme Court’s decisions should frame our analysis in this and other § 101 cases.
First and foremost is an abiding concern that patents should not be allowed to preempt the fundamental tools of discovery—those must remain “free to all ... and reserved exclusively to none.” Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). Preemption features prominently in the Supreme Court’s recent § 101 decisions, see Mayo, 132 S.Ct. at 1301 (“The Court has repeatedly emphasized ... a concern that patent law not inhibit further discovery by improperly tying up the future use of laws of nature.”); Bilski, 130 S.Ct. at 3231 (concluding that the disputed claims “would pre-empt [risk hedging] in all fields, and would effectively grant a monopoly over an abstract idea”); Diehr, 450 U.S. at 187, 101 S.Ct. 1048 (“Then-process admittedly employs a well-known mathematical equation, but they do not seek to pre-empt the use of that equation.”); Benson, 409 U.S. at 72, 93 S.Ct. 253 (“[I]f the judgment below is affirmed, the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself.”), and traces back to the earliest judicial decisions addressing subject-matter eligibility, see, e.g., O’Reilly v. Morse, 56 U.S. 62, 113, 15 How. 62, 14 L.Ed. 601 (1853) (rejecting a claim that would have broadly conferred “a monopoly” in the use of electromagnetism, “however developed, for the purpose of printing at a distance”). *1281 Guarding against the wholesale preemption of fundamental principles should be our primary aim in applying the common law exceptions to § 101.
To be clear, the proper focus is not preemption per se, for some measure of preemption is intrinsic in the statutory right granted with every patent to exclude competitors, for a limited time, from practicing the claimed invention. See 35 U.S.C. § 154. Rather, the animating concern is that claims should not be coextensive with a natural law, natural phenomenon, or abstract idea; a patent-eligible claim must include one or more substantive limitations that, in the words of the Supreme Court, add “significantly more” to the basic principle, with the result that the claim covers significantly less. See Mayo 132 S.Ct. at 1294. Thus, broad claims do not necessarily raise § 101 preemption concerns, and seemingly narrower claims are not necessarily exempt. What matters is whether a claim threatens to subsume the full scope of a fundamental concept, and when those concerns arise, we must look for meaningful limitations that prevent the claim as a whole from covering the concept’s every practical application. See id. at 1302 (“The laws of nature at issue here are narrow laws that may have limited applications, but the patent claims that embody them nonetheless implicate this concern.”).
Next, the cases repeatedly caution against overly formalistic approaches to subject-matter eligibility that invite manipulation by patent applicants. Allowing the determination of patent eligibility to “depend simply on the draftsman’s art ... would ill serve the principles underlying the prohibition against patents for ‘ideas’ or phenomena of nature.” Flook, 437 U.S. at 593, 98 S.Ct. 2522. Thus, claim drafting strategies that attempt to circumvent the basic exceptions to § 101 using, for example, highly stylized language, hollow field-of-use limitations, or.the recitation of token post-solution activity should not be credited. See Bilski, 130 S.Ct. at 3230 (“[T]he prohibition against patenting abstract ideas ‘cannot be circumvented by attempting to limit the use of the formula to a particular technological environment’ or adding ‘insignificant postsolution activity.’ ” (quoting Diehr, 450 U.S. at 191-92, 101 S.Ct. 1048)); Flook, 437 U.S. at 590, 98 S.Ct. 2522 (rejecting such an approach as “exalt[ing] form over substance”). The Supreme Court’s precedents require that we look past such devices when analyzing a claim to consider its true practical effect with respect to the purpose of § 101— preserving the “basic tools” of scientific discovery for common use.
Finally, the cases urge a flexible, claim-by-claim approach to subject-matter eligibility. that avoids rigid line drawing. Bright-line rules may be simple to apply, but they are often impractical and counterproductive when applied to § 101. Such rules risk becoming outdated in the face of continual advances • in technology—they risk “freezing] process patents to old technologies, leaving no room for the revelations of the new, onrushing technology.” Benson, 409 U.S. at 71, 93 S.Ct. 253. Stringent eligibility formulas may also lead to misplaced focus, requiring courts to “pose questions of such intricacy and refinement that they risk obscuring the larger object of securing patents for valuable inventions without transgressing the public domain.” Bilski, 130 S.Ct. at 3227. Accordingly, the Supreme Court has rejected calls for a categorical exclusion of so-called business method claims and has held that the formulaic “machine-or-transformation” test cannot be the exclusive means for determining the patent eligibility of process claims. Id. at 3227-29. What is needed is a flexible, pragmatic approach that can adapt and account for unanticipated technological advances while re *1282 maining true to the core principles underlying the fundamental exceptions to § 101.
With these basic principles in mind, the following analysis should apply in determining whether a computer-implemented claim recites patent-eligible subject matter under § 101 or falls into the common law exception for abstract ideas.
The first question is whether the claimed invention fits within one of the four statutory classes set out in § 101. Assuming that condition is met, the analysis turns to the judicial exceptions to subject-matter eligibility. A preliminary question in applying the exceptions to' such claims is whether the claim raises § 101 abstractness concerns at all. Does the claim pose any risk of preempting an abstract idea? In most cases, the answer plainly will be no. Cf. Honeywell Inc. v. Sperry Rand Corp., No. 4-67-cv-138, 180 USPQ 673, 1973 WL 903 (D.Minn. Oct. 19, 1973) (early computer hardware patents).
Where bona fide § 101 concerns arise, however, it is important at the outset to identify and define whatever fundamental concept appears wrapped up in the claim so that the subsequent analytical steps can proceed on a consistent footing. Section 101 is concerned as much with preserving narrow “basic tools” as it is with abstract concepts that have far-reaching implications—for example, risk hedging or transmitting information at a distance using electricity—and the breadth of acceptable exclusion may vary accordingly. See Mayo, 132 S.Ct. at 1302-03. In short, one cannot meaningfully evaluate whether a claim preempts an abstract idea until the idea supposedly at risk of preemption has been unambiguously identified. Although not required, conducting a claim construction analysis before addressing § 101 may be especially helpful in this regard by facilitating a full understanding of what each claim entails. See Bancorp, 687 F.3d at 1273-74.
The § 101 inquiry next proceeds to the requisite preemption analysis. With the pertinent abstract idea identified, the balance of the claim can be evaluated to determine whether it contains additional substantive limitations that narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself. See Mayo, 132 S.Ct. at 1300 (discussing a patent-eligible process claim that involved a law of nature but included additional steps “that confined the claims to a particular, useful application of the principle”); Bilski, 130 S.Ct. at 3231 (rejecting claims that “add [too little] to the underlying abstract principle”); Diehr, 450 U.S. at 187, 101 S.Ct. 1048 (“[T]hey do not seek to pre-empt the use of that, equation. Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process.”).
The requirement for substantive claim limitations beyond the mere recitation of a disembodied fundamental concept has “sometimes” been referred to as an “inventive concept.” See Mayo, 132 S.Ct. at 1294 (citing Flook, 437 U.S. at 594, 98 S.Ct. 2522). We do not read the Court’s occasional use of that language in the § 101 context as imposing a requirement that such limitations must necessarily exhibit “inventiveness” in the same sense as that term more commonly applies to two of the statutory requirements for patentability, ie., novelty and nonobviousness. See 35 U.S.C. §§ 102,103. The phrase “inventive concept” originated with Flook, yet the Court began its discussion of § 101 in that case by stating that the question of patent-eligible subject matter “does not involve the familiar issues of novelty and obviousness that routinely arise under §§ 102 and 103.” 437 U.S. at 588, 98 S.Ct. 2522. The Court has since reiterated that those separate inquiries do not bear on the question of subject-matter eligibility under § 101. *1283 Diehr, 450 U.S. at 188-89, 101 S.Ct. 1048 (“The ‘novelty’ of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.”); id. at 191, 101 S.Ct. 1048 (“A rejection on either of these [anticipation or obviousness] grounds does not affect the determination that respondents’ claims recited subject matter which was eligible for patent protection under § 101.”); see also Mayo, 132 S.Ct. at 1298-1300, 1302 (holding was consistent with Diehr and Flook and did not “depart from case law precedent”).
An “inventive concept” in the § 101 context refers to a genuine human contribution to the claimed subject matter. “The underlying notion is that a scientific principle ... reveals a relationship that has always existed.” Flook, 437 U.S. at 593 n. 15, 98 S.Ct. 2522. From that perspective, a person cannot truly “invent” an abstract idea or scientific truth. He or she can discover it, but not invent it. Accordingly, an “inventive concept” under § 101—in contrast to whatever fundamental concept is also represented in the claim—must be “a product of human ingenuity.” See Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204.
In addition, that human contribution must represent more than a trivial appendix to the underlying abstract idea. The § 101 preemption analysis centers on the practical, real-world effects of the claim. See, e.g., Mayo, 132 S.Ct. at 1294 (“[A] process that focuses upon the use of a natural law [must] also contain other elements ... sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.”); Bilski, 130 S.Ct. at 3231 (rejecting claims that would “effectively grant a monopoly over an abstract idea”); Benson, 409 U.S. at 71-72, 93 S.Ct. 253 (“[T]he patent ... in practical effect would be a patent on the algorithm itself.”). Limitations that represent a human contribution but are merely tangential, routine, well-understood, or conventional, or in practice fail to narrow the claim relative to the fundamental principle therein, cannot confer patent eligibility;
For example, the “administering” and “determining” steps in Mayo might have appeared to be concrete limitations representing true human contributions to the claimed methods; it is difficult to see how giving a particular man-made drug to a patient or drawing and testing blood could be considered purely abstract or preordained. Yet the Court held that those steps failed to render the claims patent eligible because, as a practical matter, they were necessary to every practical use of what it found to be a natural law and therefore, were not truly limiting. Mayo, 132 S.Ct. at 1298 (“Anyone who wants to make use of these laws must first administer a thiopurine drug and measure the resulting metabolite concentrations.... ”); see also Benson, 409 U.S. at 71, 93 S.Ct. 253 (noting that the “mathematical formula involved here has no substantial practical application except in connection with a digital computer”). Also in Mayo, the Court instructed.that the added steps, apart from the natural law itself, must amount to more than “well-understood, routine, conventional activity previously engaged in by researchers in the field.” 132 S.Ct. at 1294. Similarly, token or trivial limitations, see Diehr, 450 U.S. at 191-92, 101 S.Ct. 1048 (stating that “insignificant post-solution activity will not transform an unpatentable principle into a patentable process”), or vague limitations, cast in “highly general language,” Mayo, 132 S.Ct. at 1302, have failed to satisfy § 101. Finally, bare field-of-use limitations cannot rescue a claim from patent ineligibility where the *1284 claim as written still effectively preempts all uses of a fundamental concept within the stated field. Bilski, 130 S.Ct. at 3230 (discussing Flook and Diehr). Whether a particular claim satisfies the § 101 standard will vary based on the balance of factors at play in each case, and the fact that there is no easy bright-line test simply emphasizes the need for the PTO and the courts to apply the flexible analysis above to the facts at hand.
Thus, the Supreme Court used the language “routine” and “conventional” in Mayo to indicate what qualities added to a natural law do not create patent-eligible subject matter. See Mayo, 132 S.Ct. at 1298. We do not therefore understand that language to be confused with novelty or nonobviousness analyses, which consider whether particular steps or physical components together constitute a new or nonobvious invention. Analyzing patent eligibility, in contrast, considers whether steps combined with a natural law or abstract idea are so insignificant, conventional, or routine as to yield a claim that effectively covers the natural law or abstract idea itself.
Two other considerations are worth noting with respect to the § 101 analysis. First, some have argued that because § 101 is a “threshold test,” Bilski, 130 S.Ct. at 3225, district courts must always consider subject-matter eligibility first among all possible bases for finding invalidity. That is not correct. District courts are rightly entrusted with great discretion to control their dockets and the conduct of proceedings before them, including the order of issues presented during litigation. See, e.g., Amado v. Microsoft Corp., 517 F.3d 1353, 1358 (Fed.Cir.2008) (“District courts ... are afforded broad discretion to control and manage their dockets, including the authority to decide the order in which they hear and decide issues pending before them.”). In addition, district courts may exercise their discretion to begin elsewhere when they perceive that another section of the Patent Act might provide a clearer and more expeditious path to resolving a dispute. See MySpace, Inc. v. GraphOn Corp., 672 F.3d 1250, 1258-62 (Fed.Cir.2012); Dennis Crouch & Robert P. Merges, Operating Efficiently Posi-Bilski by Ordering Patent Doctrine DecisiorirMaking, 25 Berkeley Tech. L.J. 1673 (2010).
Second, it bears remembering that all issued patent claims receive a statutory presumption of validity. 35 U.S.C. § 282; Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011). And, as with obviousness and enablement, that presumption applies when § 101 is raised as a basis for invalidity in district court proceedings. See OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc., 701 F.3d 698, 706 (Fed.Cir.2012) (obviousness); Nat’l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc., 166 F.3d 1190, 1195 (Fed.Cir.1999) (enablement).
Applying the above considerations to assess the patent eligibility of the specific computer-implemented claims at issue in this appeal, we conclude that the district court correctly held that the asserted claims drawn to methods, computer-readable media, and systems are not patent eligible and are hence invalid under § 101.
III. The Patents in Suit
In this case, Alice has asserted four patents against CLS. As described, the asserted patents share substantially the same specification and disclose and claim computerized methods, computer-readable media, and systems that are useful for conducting financial transactions using a third party to settle obligations between a first and second party so as to mitigate “settlement risk.” Briefly, the asserted *1285 claims are as follows: claims 33 and 34 of the '479 patent recite methods; all claims of the '510 patent also recite methods; all claims of the '720 patent recite data processing systems; and the claims of the '375 patent recite either data processing systems (claims 1-38 and 42—47) or computer-readable storage media having a computer program stored therein (claims 39-41). CLS contends that the asserted claims fall into the abstract ideas exception to § 101 and are therefore invalid as directed to patent-ineligible subject matter.
A. Method Claims
Claim 33 of the '479 patent is representative of the asserted method claims:
33. A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:
(a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;
(b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;
(c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party’s shadow credit record or shadow debit record, allowing only these transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order; and
(d)at the end-of-day, the supervisory institution instructing'ones of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions.
'479 patent col. 65 11. 23-50. The claim thus recites a method for facilitating a previously arranged exchange between two parties requiring the use of “shadow” records maintained by a third-party “supervisory institution.” Briefly, the claimed process requires the supervisory institution to create shadow records for each party that mirror the parties’ real-world accounts held at their respective “exchange institutions.” At the start of each day, the supervisory institution updates its shadow records to reflect the value of the parties’ respective accounts. Transactions are then referred to the supervisory institution for settlement throughout the day, and the supervisory institution responds to each in sequence by adjusting the shadow records and permitting only those transactions for which the parties’ updated shadow records indicate sufficient resources to satisfy their mutual obligations. At the end of each day, the supervisory institution irrevocably instructs the exchange institutions to carry out the permitted transactions. Although claim 33 does not expressly recite any computer-based steps,[3] the parties have agreed that the recited shadow records and transactions require computer implementation. CLS Bank, 768 F.Supp.2d at 236.
Claim 33 plainly recites a process. The issue presented then becomes whether *1286 that process amounts to no more than a patent-ineligible abstract idea. As described, the first step in that analysis requires identifying the abstract idea represented in the claim. The methods claimed here draw on the abstract idea of reducing settlement risk by effecting trades through a third-party intermediary (here, the supervisory institution) empowered to verify that both parties -can fulfill their obligations before allowing the. exchange—i.e., a form of escrow. CLS describes that concept as “fundamental and ancient,” but the latter is not determinative of the question of abstractness. Even venerable concepts, such as risk hedging in commodity transactions, see Bilski, 130 S.Ct. at 3231, were once unfamiliar, just like the concepts inventors are unlocking at the leading edges of technology today. But whether long in use or just recognized, abstract ideas remain abstract. The concept of reducing settlement risk by facilitating a trade through third-party intermediation is an abstract idea because it is a “disembodied” concept, In re Alappat, 33 F.3d 1526; 1544 (Fed.Cir.1994) (en banc), a basic building block of human ingenuity, untethered from any real-world application. Standing alone, that abstract idea is' not patent-eligible subject matter.
The analysis therefore turns to whether the balance of the claim adds “significantly more.” Apart from the idea of third-party intermediation, the claim’s substantive limitations require creating shadow records, using a computer to adjust and maintain those shadow records, and reconciling shadow records and corresponding exchange institution accounts through end-of-day transactions. None of those limitations adds anything of substance to the claim.
First, the requirement for computer implementation could scarcely be introduced with less specificity; the claim lacks any express language to define the computer’s participation. In a claimed method comprising an abstract idea, generic computer automation of one or more steps evinces little human contribution. There is no specific or limiting recitation of essential, see SiRF Tech., Inc. v. Int’l Trade Comm’n, 601 F.3d 1319, 1332-33 (Fed.Cir.2010), or improved computer technology, see Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859, 865, 868-69 (Fed.Cir.2010), and no reason to view the computer limitation as anything but “insignificant postsolution activity” relative to the abstract idea, see Fort Props., Inc. v. Am. Master Lease LLC, 671 F.3d 1317, 1323-24 (Fed.Cir.2012). Furthermore, simply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility. Bancorp, 687 F.3d at 1278; Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1333 (Fed.Cir.2012); Fort Props., 671 F.3d at 1323-24. That is particularly apparent in this case. Because of the efficiency and ubiquity of computers, essentially all practical, real-world applications of the abstract idea implicated here would rely, at some level, on basic computer functions—for example, to quickly and reliably calculate balances or exchange data among financial institutions. At its most basic, a computer is just a calculator capable of performing mental steps faster than a human could. Unless the claims require a computer to perform operations that are not merely accelerated calculations, a computer does not itself confer patent eligibility. In short, the requirement for computer participation in these claims fails to supply an “inventive concept” that represents a nontrivial, non-conventional human contribution or materially narrows the claims relative to the abstract idea they embrace.
Nor does requiring the supervisory institution to create and adjust a “shadow *1287 credit record” and a “shadow debit record” narrow the claims from the realm of abstraction. With the term “shadow record,” the claim uses extravagant language to recite a basic -function required of any financial intermediary in an escrow arrangement—tracking each party’s obligations and performance. Viewed properly as reciting no more than the necessary tracking activities of a supervisory institution, the steps relating to creating a “shadow record” and then obtaining and adjusting its balance are insignificant ‘“[pre]solution activity,’ ” Mayo, 132 S.Ct. at 1298 (alteration in original) (quoting Flook, 437 U.S. at 590, 98 S.Ct. 2522), and ancillary “data-gathering steps,” CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1370 (Fed.Cir.2011), and therefore add nothing of practical significance to the underlying idea of reducing settlement risk through intermediation.
Finally, providing end-of-day instructions to the exchange institutions to reconcile the parties’ real-world accounts with the day’s accumulated adjustments to their shadow records is a similarly trivial limitation that does not distinguish the claimed . method. According to the claim, each permitted transaction during the day prompts corresponding shadow record adjustments, which the exchange institutions must hon- or as “irrevocable” payment obligations. E.g., '479 patent col. 6511. 36-50. Whether the instructions are issued in real time, every two hours, or at the end of every day, there is no indication in the record that the precise moment chosen to execute those payments makes any significant difference in the ultimate application of the abstract idea.
In sum, there is nothing in the asserted method claims that represents “significantly more” than the underlying abstract idea for purposes of § 101. But for the implied requirement for computer implementation, the broad, non-technical method claims presented here closely resemble those in Bilski, which also explained a “basic concept of ... protecting against risk.” 130 S.Ct. at 3231. And, as described, adding generic computer functions to facilitate performance provides no substantial limitation and therefore is not “enough” to satisfy § 101. As in Bilski, upholding Alice’s claims to methods of financial intermediation “would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.” Id. Consequently, the method claims are drawn to patent-ineligible subject matter and invalid under § 101.
We note that, while other opinions of judges in this case use different language and reasoning, two other judges, in addition to those joining this opinion, join in the result of patent ineligibility as to Alice’s asserted method claims.
B. Computer-Readable Medium Claims
Claims 39-41 of the '375 patent are so-called “Beauregard claims,” named for In re Beauregard, 53 F.3d 1583 (Fed. Cir.1995). Claims in Beauregard format formally recite a tangible article of manufacture—a computer-readable medium, such as a computer disk or other data storage device—but such claims also require the device to contain a computer program for directing a computer to carry out a specified process. Claim 39 of the '375 patent reads:
39. A computer program product comprising a computer readable storage medium having computer readable program code embodied in the medium for use by a party to exchange an obligation between a first party and a second party, the computer program product comprising:
program code for causing a computer to send a transaction from said first party relating to an exchange obligation *1288 arising from a currency exchange transaction between said first party and said second party; and
program code for causing a computer to allow viewing of information relating to processing, by a supervisory institution, of said exchange obligation, wherein said processing includes (1) maintaining information about a first account for the first party, independent from a second account maintained by a first exchange institution, and information about a third account for the second party, independent from a fourth account maintained by a second exchange institution; (2) electronically adjusting said first account and said third account, in order to effect an exchange obligation arising from said transaction between said first party and said second party, after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and (3) generating an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with the adjustment of said first account and/or said third account, wherein said instruction being an irrevocable, time invariant obligation placed on said first exchange institution and/or said second exchange institution.
'375 patent col. 68 11. 5-35 (emphasis added).
Claim 39 thus nominally recites as its subject matter a physical device—a “computer readable storage medium” that would fall into a § 101 category separate from the methods discussed above and would at first blush seem less susceptible to abstractness concerns. But under § 101 we must look past drafting formalities and let the true substance of the claim guide our analysis. Here, although the claim’s preamble appears to invoke a physical object, the claim term “computer readable storage medium” is stated in broad and functional terms—incidental to the claim—and every substantive limitation presented in the body of the claim (as well as in dependent claims 40 and 41) pertains to the method steps of the program code “embodied in the medium.” Therefore, claim 39 is not “truly drawn to a specific computer readable medium, rather than to the underlying method” of reducing settlement risk using a third-party intermediary. CyberSource, 654 F.3d at 1374-75 (internal quotation marks omitted). Despite their Beauregard format, Alice’s “computer readable medium claims” are thus equivalent to the methods they recite for § 101 purposes. In other words, they are merely method claims in the guise of a device and thus do not overcome the Supreme Court’s warning to avoid permitting a “competent draftsman” to endow abstract claims with patent-eligible status.
Of course, all claims are normally to be considered separately, but discrete claims reciting subject matter only nominally from different statutory classes may war- ■ rant similar substantive treatment under § 101 when, in practical effect, they cover the same invention. That may be particularly apparent where, as here, a claim presents a physical recitation of an abstract method, and parallel claims from the same patent family claim that same abstract method in the same or similar terms. So considered, claims 39-41 of the '375 patent fail the patent-eligibility test for the same reasons as the cognate method claims discussed above. The “program code” of claim 39 “caus[es] a computer” to perform a method of escrow that is indistinguishable from that recited in claim 33 of the '479 patent, and no less abstract. Accordingly, claims 39-41 of the '375 patent are invalid under § 101. As with the *1289 method claims, two other judges of this court, in addition to those joining this opinion, similarly conclude that the computer-readable medium claims are not patent eligible.
C. System Claims
The remaining claims in this appeal recite “data processing systems” configured to enable the exchange of mutual obligations through an intermediary—in these claims, the computer system itself. Before addressing these claims in particular, we again note that our colleagues on the court, other than those joining this opinion, have agreed that, at least in this case, the method, medium, and system claims should be considered together for purposes of § 101. Three other judges on this court—for a total of eight—have so concluded.
Claim 1 of the '720 patent is representative of the contested system claims:
1. A data processing system to enable the exchange of an obligation between parties, the system comprising:
a data storage unit having stored therein information about a shadow credit record and shadow debit record for a party, independent from a credit record and debit record maintained by an exchange institution; and
a computer, coupled to said data storage unit, that is configured to (a) receive a transaction; (b) electronically adjust said shadow credit record and/or said shadow debit record in order to effect an exchange obligation arising from said transaction, allowing only those transactions that do not result in a value of said shadow debit record being less than a value of said shadow credit record; and (c) generate an instruction to said exchange institution at the end of a period of time to adjust said credit record and/or said debit record in accordance with the adjustment of said shadow credit record and/or said shadow debit record, wherein said instruction being an irrevocable, time invariant obligation placed on said exchange institution.
'720 patent col. 65 11. 42-61 (emphases added). As is apparent, the claim recites a computerized system configured to carry out a series of steps that mirror Alice’s method claims—maintaining shadow records, allowing only those transactions supported by adequate value in the shadow records, adjusting the shadow records pursuant to such transactions, and later instructing exchange institutions to execute the allowed transactions. Indeed, Alice’s method and system claims use similar and often identical language to describe those actions. Compare id. col. 65 11. 44-61, with '479 patent col. 65 11. 28-50. The system claims are different, however, in that they also recite tangible devices as system components, including at least “a computer” and “a data storage unit.” Other claims specify additional components, such as a “first party device” and a “communications controller.” See, e.g., '375 patent col. 66 11. 65-66. Similar to the computer readable medium claims, the system claims are formally drawn to physical objects and therefore raise a question whether they deserve to be evaluated differently under the abstract ideas exception from the accompanying method claims discussed above. Careful analysis shows that they do not.
For some system claims, the abstract ideas exception may indeed be plainly inapplicable, and such claims will face little difficulty passing through the § 101 filter. But applying a presumptively different approach to system claims generally would reward precisely the type of clever claim drafting that the Supreme Court has repeatedly instructed us to ignore. As illustrated by the obvious parallels between the method and system claims now before us, it is often a straightforward exercise to *1290 translate a method claim into system form, and vice versa. That much has long been recognized. See In re Johnston, 502 F.2d 765, 773 (CCPA 1974) (Rich, J., dissenting) (noting that “[e]very competent draftsman” knows how to cast method claims “in machine system form”). Thus, when § 101 issues arise, the same analysis should apply regardless of claim format: Does the claim, in practical effect, place an abstract idea at risk of preemption? And, if so, do the limitations of the claim, including any computer-based limitations, add “enough” beyond the abstract idea itself to limit the claim to a narrower, patent-eligible application of that idea? Or, is it merely a Trojan horse designed to enable abstract claims to slide through the screen of patent eligibility?
The computer-based limitations recited in the system claims here cannot support any meaningful distinction from the computer-based limitations that failed to supply an “inventive concept” to the related method claims. The shadow record and transaction limitations in Alice’s method claims require “a computer,” CLS Bank, 768 F.Supp.2d at 236, evidently capable of calculation, storage, and data exchange. The system claims are little different. They set forth the same steps for performing third-party intermediation and provide for computer implementation at an incrementally reduced, though still striking level of generality. Instead of wholly implied computer limitations, the system claims recite a handful of computer components in generic, functional terms that would encompass any device capable of performing the same ubiquitous calculation, storage, and connectivity functions required by the method claims.
For example, method claim 33 of the '479 patent requires “creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions.” '479 patent col. 65 11. 28-31. In system claim 26 of the '375 patent, which is among the system claims that recite the most computer hardware, “a data storage unit” performs the analogous function. That claim recites “a data storage unit having stored therein (a) information about a first account for a first party, independent from a second account maintained by a first exchange institution, and (b) information about a third account for a second party, independent from a fourth account maintained by a second exchange institution.” '375 patent col. 67 11. 1-7.
Likewise, other steps of method claim 33 include (i) “for every transaction ... adjusting each respective party’s shadow credit record or shadow debit record, allowing only these transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time,” and (ii) “instructing ones of the exchange institutions to exchange credits or debits ... in accordance with the adjustments of the said permitted transactions.” '479 patent col. 65 11. 36^18. Similarly, system claim 26 recites:
[A] computer, coupled to said data storage unit and said communications controller, that is configured to (a) receive a transaction from said first party device via said communications controller; (b) electronically adjust said first account and said third account ... after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and (c) generate an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with *1291 the adjustment of said first account and/or said third account....
'375 patent col. 6711. 8-23.
Despite minor differences in terminólo-’ gy, e.g., first and third “independent” accounts instead of “shadow” records, the asserted method and system claims require performance of the same basic process. Although the system claims associate certain computer components with some of the method steps, none of the recited hardware pffers a meaningful limitation beyond generally linking “the use of the [method] to a particular technological environment,” that is, implementation via computers. Bilski, 130 S.Ct. at 3230 (quoting Diehr, 450 U.S. at 191, 101 S.Ct. 1048) (internal quotation marks omitted); see Mayo, 132 S.Ct. at 1301 (“[The Court in Benson ] held that simply implementing a mathematical principle on a physical machine, namely a computer, was not a patentable application of that principle.”). For all practical purposes, every general-purpose computer will include “a computer,” “a data storage unit,” and “a communications controller” that would be capable of performing the same generalized functions required of the claimed systems to carry out the otherwise abstract methods recited therein.
Therefore, as with the asserted method claims,[4] such limitations are not actually limiting in the sense required under § 101; they provide no significant “inventive concept.” The system-claims are instead akin to stating the abstract idea of third-party intermediation and adding the words: “apply it” on a computer. See Mayo, 132 S.Ct. at 1294. That is not sufficient for patent eligibility, and the system claims before us fail to define patent-eligible subject matter under § 101, just as do the method and computer-readable medium claims.
One of the separate opinions in this case, concurring in part in the judgment, takes aim at this opinion, asserting that the system claims here are simply claims to a patent-eligible machine, a tangible item one can put on one’s desk. Machines are unquestionably eligible for patenting, states the opinion, although the system claims here clearly track the method claims that the separate opinion concedes are not patent eligible.
That conclusion is surely correct as an abstract proposition. A particular computer system, composed of wires, plastic, and silicon, is no doubt a tangible machine. But that is not the question. The question we must consider is whether a patent claim that ostensibly describes such a system on its face represents something more than an abstract idea in legal substance. Claims to computers were, and still are, eligible for patent. No question should have arisen concerning the eligibility of claims to basic computer hardware under § 101 when such devices were first invented. But we are living and judging now (or at least as of the patents’'- priority dates), and have before us not the patent eligibility of specific types of computers or computer components, but computers that have routinely been adapted by software consisting of abstract ideas, and claimed as such, to do all sorts of tasks that formerly were performed by humans. And the Supreme Court has told us that, while avoiding confusion between § 101 and §§ 102 and 103, merely adding existing computer *1292 technology to abstract ideas—mental steps—does not as a matter of substance convert an abstract idea into a machine.
That is what we face when we have a series of claims to abstract methods and computers fitted to carry out those methods. We are not here faced with a computer per se. Such are surely patent-eligible machines. We are faced with abstract methods coupled with computers adapted to perform those methods. And that is the fallacy of relying on Alappat, as the concurrence in part does. Not only has the world of technology changed, but the legal world has changed. The Supreme Court has spoken since Alappat on the question of patent eligibility, and we must take note of that change. Abstract methods do not become patent-eligible machines by being clothed in computer language.
Conclusion
As described, we agree with the district court and conclude that the asserted method, computer-readable medium, and system claims of Alice’s '479, '510, '720, and '375 patents are invalid under § 101 for failure to recite patent-eligible subject matter.
Concurring-in-part and dissenting-in-part opinion filed by RADER, Chief Judge, LINN, MOORE, and O’MALLEY, Circuit Judges, as to all but part VI of that opinion. RADER, Chief Judge, and MOORE, Circuit Judge, as to part VI of that opinion.

. While Chief Judge Rader is correct to note that no single opinion issued today commands a majority, seven of the ten members, a majority, of this en banc court have agreed that the method and computer-readable medium claims before us fail to recite patent-eligible subject matter. In addition, eight judges, a majority, have concluded that the particular method, medium, and system claims at issue in this case should rise or fall together in the § 101 analysis.

. Claim 8 required a computer on its face, but the literal terms of claim 13 were not so limited. See Benson, 409 U.S. at 73-74, 93 S.Ct. 253. The CCPA, however, had interpreted both claims as requiring a computer and had upheld them on that basis, see In re Benson, 58 CCPA 1134, 441 F.2d 682, 687-88 (1971), and the Supreme Court appeared to adopt that assumption.

. The method claims of the '510 patent state that the supervisory institution "electronically adjust[s]” the shadow records. E.g., '510 patent col. 64 11. 11-12.

. To be clear, the fact that one or more related method claims has failed under § 101, as here, does not dictate that all associated system claims or even all associated method claims must suffer the same fate. For example, a system claim that builds on the same abstract idea as a patent-ineligible method may well incorporate sufficient additional limitations, computer-based or otherwise, to transform that idea into a patent-eligible application. But that is not the case here.